UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 26-mj-760 (ECW)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHEIKHDOON ABDULLAHI MOHAMUD,<br><br>Defendant. | ) | ORDER OF DETENTION |

This matter came before the Court on October 19, 2026, for a preliminary and detention hearing. (ECF No. 9.) The defendant, Sheikhdoon Abdullahi Mohamud, appeared in custody and was represented by his appointed counsel, Assistant Federal Defenders Manny Atwal and Siri McDowell. The United States was represented by Assistant United States Attorney Benjamin Bejar.

The United States moved for detention at Mr. Mohamud's initial appearance on October 7, 2026, where Mr. Mohamud appeared on a Complaint (ECF No. 1) and was advised of his constitutional rights and afforded opportunity to consult with his appointed counsel. (ECF No. 3.) *See* Fed. R. Crim. P. 5(d).

After consideration of the pretrial services report, the record before the Court, the evidence adduced, the arguments of counsel, the very serious nature of the current charge, the rebuttable presumption in favor of detention, and the factors listed in 18 U.S.C. § 3142(g), the Court finds probable cause to support the charge in the criminal Complaint (ECF No. 1) and orders Mr. Mohamud bound over to the District Court for further proceedings by a United States Grand Jury. *See* Fed. R.

Crim. P. 5.1(e). The Court also concludes by a preponderance of the evidence that no condition or combination of conditions of release will reasonably ensure Mr. Mohamud's future appearance as required, and further finds by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of the community if Mr. Mohamud is released pending trial. Accordingly, the Court grants the United States' motion for detention.

## FINDINGS OF FACT

1. Mr. Mohamud is presently charged by a criminal Complaint with one count of knowingly receiving a firearm and ammunition—on or about October 6, 2026—knowing or having reasonable cause to believe the firearm and ammunition would be used to commit a felony or federal crime of terrorism, all in violation of 18 U.S.C. § 924(h), which carries a statutory maximum sentence of 15 years' imprisonment. (ECF No. 1.) The Court issued the Complaint and arrest warrant on October 7, 2026 based on the sworn Affidavit of FBI Special Agent Keegan Rupenthal filed in support of the Complaint. (ECF No. 1-1.)

2. At the hearing, the United States called as a witness SA Rupenthal, who testified regarding the facts and circumstances of the nearly two-year investigation, Mr. Mohamud's arrest and alleged receipt of the firearm and ammunition, and his subsequent statements and Mirandized interview. (ECF No. 9.) The Court also received into evidence without objection Government Exhibits 1 through 13, which primarily consisted of the Complaint affidavit, foreign terrorist organization propaganda video still shots, various snips of online message exchanges between Mr.

Mohamud and an FBI confidential source, a still shot of Mr. Mohamud's video allegedly pledging his allegiance to ISIS (a designated foreign terrorist organization (FTO)), photos of the alleged firearm, high-capacity magazines, and ammunition received by Mr. Mohamud, and an FBI rights advisory form signed by Mr. Mohamud. (ECF No. 9.)

3. According to the testimony, beginning in or about December 2024, Mr. Mohamud began exchanging online messages, videos, and photographs with an FBI confidential source on various encrypted messaging apps and social media platforms, wherein Mr. Mohamud discussed his intent to either travel overseas to Somalia to join a designated FTO and fight on its behalf or commit a mass-casualty shooting event in Minnesota on behalf of the FTO. The confidential source portrayed himself to Mr. Mohamud as an ISIS fighter in Syria. When Mr. Mohamud determined he could not save enough money to purchase an airplane ticket to Somalia, he told the confidential source he wanted to purchase an AK-47 and multiple rounds of ammunition and commit a mass shooting at the Mall of America, where he hoped to kill as many as 60 people—referring to them as "kuffar," a derogatory term meaning non-believers or infidels. Part of Mr. Mohamud's reasons for the planned attack was his stated belief that the Mall of America was owned by Jews.

4. Based on the testimony, during his communications with the confidential source, Mr. Mohamud praised several ISIS-inspired attacks, including the January 2025 New Orleans New Year's Day vehicle ramming that killed 14 people, the December 2025 Bondi Beach, Australia, mass-shooting of people celebrating the

Jewish holiday of Hanukah, the 2016 mass-shooting at the Pulse nightclub in Orlando, Florida, and the 2026 vehicle ramming of people at a pride festival in Berlin, Germany. Mr. Mohamud also sent the confidential source various FTO propaganda videos, depicting fighters, the ISIS black flag with white emblem, and violent terrorist acts, including the apparent mass shooting of multiple captured soldiers by alleged ISIS fighters. (*See e.g.,* Gov't Ex. 3.)

5. SA Rupenthal further testified that, when the confidential source told Mr. Mohamud that the source knew another ISIS affiliate who could sell him an AK-47, Mr. Mohamud responded that he would buy the weapon with cash and thanked the source in Arabic. Mr. Mohamud suggested a date and place for his purchasing of the AK-47, sent a photo of himself so that the seller would be able to recognize him for the transaction, and later sent the source a video of Mr. Mohamud counting out $600 cash to show that he had the money to purchase the firearm and ammunition. Mr. Mohamud did not appear for the transaction on the originally-suggested date, but he continued his communications with the confidential source about the purchase.

6. According to the testimony, Mr. Mohamud also selected the date of his planned attack at the Mall of America when a Hmong celebration festival would be occurring in late October 2026, again referring to the intended victims as kuffar and stating he would shoot as many people as he could, similar to what the Pulse nightclub shooter had done. Mr. Mohamud told the source that he had watched videos of that shooting and believed he could do the same.

7. According to the testimony of SA Rupenthal, on at least two occasions the source asked Mr. Mohamud if he was sure he wanted to purchase the firearm and ammunition to carry out the attack and provided Mr. Mohamud the opportunity to back out of the planned firearm purchase, but each time Mr. Mohamud assured the source that he was 100% committed and stated if he were not sure he would have already backed out. When the source told Mr. Mohamud that the purchase of the firearm and ammunition could take place on October 6, Mr. Mohamud responded in part with a sunglasses emoji.

8. According to SA Rupenthal, in September 2026, Mr. Mohamud send the source a selfie-style video of himself, with his head and face wrapped in a red and white scarf, wherein he allegedly pledged his allegiance to ISIS. (Gov't Ex. 10.) Mr. Mohamud posted that he "made the video so dawlah know i do attack," and he pronounced his allegiance to the apparent leader of ISIS. (*Id.*) SA Rupenthal testified that "dawlah" is an alias for ISIS and part of its designation by the State Department as an FTO.

9. SA Rupenthal further testified that on October 6, 2026, FBI surveilled Mr. Mohamud travelling from his residence to a nearby location where Mr. Mohamud met with an undercover FBI employee (UCE) inside a vehicle to purchase the firearm and ammunition. The UCE told Mr. Mohamud that he was an active ISIS member. Mr. Mohamud explained to the UCE his plans to shoot kuffar at the Mall of America during the Hmong festival, again expressed his hatred of Jews, and provided the UCE $600 cash in exchange for an AK-47 assault rifle, four 30-round magazines, and about

200 rounds of high-caliber ammunition. (Gov't Exs. 11, 12.) After Mr. Mohamud received the firearm and ammunition and exited the vehicle, the FBI arrested him and took him into custody. SA Rupenthal stated that Mr. Mohamud bit one of the FBI agents involved in Mr. Mohamud's arrest.

10. During his transport to the FBI's facility, Mr. Mohamud allegedly made various spontaneous admissions, again pledged his allegiance to the ISIS leader, and stated that he wanted to be like the person who committed the mass shooting at Fort Hood. According to SA Rupenthal, Mr. Mohamud agreed to speak with the FBI at the FBI facility after being advised of and waiving his Miranda rights and signing a rights-advisory form. (Gov't Ex. 13.) During the interview, Mr. Mohamud again confirmed that he planned to kill people at the Mall of America at the festival with the firearm he purchased for $600, affirmed the attack would be in support of ISIS, and again pledged his allegiance to the ISIS.

11. Based on the testimony, Mr. Mohamud expressed on multiple occasions a desire to die in the planned attack.

12. At the hearing, through his appointed counsel and based on the Pretrial Services Report, Mr. Mohamud, established that he has strong ties to the community, family support, and no criminal record. Defense counsel further argued that Mr. Mohamud was just 16 years old and was not committed to participating in a mass-shooting when the confidential source, an adult, began communicating with him. Mr. Mohamud argued for release to his residence or halfway house with GPS location-monitoring and home confinement.

## CONCLUSIONS OF LAW

Based upon the foregoing, the Court makes the following conclusions of law:

1. The totality of the evidence and testimony presented provides probable cause to believe that on October 6, 2026, Mr. Mohamud knowingly received a firearm and ammunition knowing that they would be used to commit a felony or federal crime of terrorism, in violation of 18 U.S.C. § 924(h). Accordingly, probable cause exists to support the charge in the criminal Complaint, and Mr. Mohamud is bound over to the District Court for further proceedings by a United States Grand Jury.

2. Under 18 U.S.C. § 3142(e)(3)(C), a rebuttable presumption in favor of detention arises in this matter because the offense alleged involves a federal crime of terrorism within the meaning of 18 U.S.C. § 2332b(g)(5)(B), namely, an alleged violation of 18 U.S.C. § 2339B (relating to material support of terrorist organizations), and that statute carries a statutory maximum of more than 10 years' imprisonment.

3. Mr. Mohamud presented sufficient credible evidence to rebut the presumption in favor of detention, including his strong community and family ties and his lack of any criminal record.

4. Although the Court finds that Mr. Mohamud presented some credible evidence to rebut the presumption in favor of detention, it still remains a factor to be considered along with the § 3142(g) factors, *see United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003), and the totality of the evidence as well as consideration of the § 3142(g) factors convinces the Court that detention is warranted based on both the

risk of non-appearance and the danger to the community prongs should Mr. Mohamud be released pending the proceedings in this matter.

5. Based on the pretrial services report (which recommended detention), the arguments of counsel, the totality of the evidence adduced, the entirety of the record before the Court, the very serious nature of the current charge, the rebuttable presumption in favor of detention, and the factors listed in 18 U.S.C. § 3142(g), no condition or combination of conditions will reasonably assure Mr. Mohamud's appearance as required or assure the safety of the community should Mr. Mohamud be released pending trial. *See United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986) (recognizing that either danger to the community or risk of flight is sufficient to authorize detention).

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Mr. Mohamud is bound over to the District Court for further proceedings by a United States Grand Jury;

2. The motion of the United States to detain Mr. Mohamud is **GRANTED**;

3. Mr. Mohamud is committed to the custody of the Attorney General for confinement in a correctional facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

4. Mr. Mohamud shall be afforded reasonable opportunity to consult privately with counsel; and

5. Upon Order of the Court or request by the United States Attorney, the person in charge of the corrections facility in which Mr. Mohamud is confined shall

deliver Mr. Mohamud to the United States Marshal for the purpose of appearance in connection with further court proceedings.

Dated: October 22, 2026

*s/ Dulce J. Foster*
DULCE J. FOSTER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MINNESOTA